**WAGIO KONG TJAUW WONG, Plaintiff,**

v.

**P. A. ESPERDY, as District Director for the New York District, Immigration and Naturalization Service, United States Department of Justice, Defendant.**

United States District Court
S. D. New York.

Jan. 31, 1963.

John L. Murff, New York City, for plaintiff.

Robert M. Morgenthau, U. S. Atty. for Southern District of New York, New York City, Roy Babitt, Sp. Asst. U. S. Atty., of counsel, for defendant.

WEINFELD, District Judge.

This is an action to review the denial of plaintiff's application to adjust his status from a nonimmigrant to that of a permanent resident immigrant. The parties are in accord that the matter is ripe for disposition and each moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

The legal issue revolves about the appropriate quota to which plaintiff's application is chargeable. The essential facts are not in dispute. The plaintiff was born in Surinam (Dutch Guiana), of which he is a citizen. His father is a full-blooded Chinese and his mother is a full-blooded Indonesian. He lawfully entered the United States in 1953 as a student and ever since has been a bona fide nonimmigrant. He has pursued studies here leading to a degree in electrical engineering. In 1960 he became the beneficiary of an approved visa petition conferring upon him first preference quota status under section 203(a) (1) of the Immigration and Nationality Act of 1952[1] which permits such preferential consideration to aliens of special skills whose services are urgently needed in, and are likely to be beneficial to the national economy, cultural interests or welfare of the United States.

In March, 1961 plaintiff applied to change his status from a nonimmigrant

[1]. 66 Stat. 163, 178 (1952), as amended, 71 Stat. 639 (1957), 8 U.S.C. § 1153(a) (1) (1958).

alien to that of a permanent resident quota immigrant. To avoid the necessity of leaving the United States and then returning with a visa, plaintiff sought adjustment of his status under section 245 of the Act, which authorizes such action by the Attorney General when it appears that an immigration visa is available to the alien at the time his application is approved.[2] At this point the dispute arose. The District Director ruled that the plaintiff was chargeable to the "Chinese persons" quota, rather than the "Asia-Pacific triangle" quota, to which plaintiff contends he is chargeable. The ruling was premised on regulations promulgated by the Secretary of State which (1) define "Chinese person,"[3] (2) provide that "regardless of his place of birth" he is chargeable to the "Chinese persons" racial quota,[4] and (3) exclude a "Chinese person" from quota chargeability to the Asia-Pacific triangle quota.[5]

Plaintiff contends that the regulations applied to an immigrant such as he run counter to the provisions of section 202 of the 1952 Act[6] which govern the quota chargeability of aliens who are attributable by at least one-half their ancestry to a people or peoples indigenous to the Asia-Pacific triangle. He points in particular to section 202(b) (6) under which he claims he is chargeable to the Asia-Pacific triangle quota. The parties agree that if chargeable to the "Chinese persons" quota, plaintiff's application was properly denied, since the first preferences thereunder were and are exhausted; if chargeable to the Asia-Pacific triangle quota, his application should have been granted, since a visa was and is immediately available under that quota.

The determintion of the issue requires reference to the provisions of the Immigration and Nationality Act of 1952 and to certain repealed sections of earlier acts which touch upon the quota system.[7]

The first Chinese Exclusion Act was enacted in 1882 and generally barred persons of the Chinese race, especially Chinese laborers, from entering the United States.[8] This restrictive policy was continued without substantial change for over sixty years. On December 17, 1943 Congress repealed all Chinese exclusion acts and persons of the Chinese race were made eligible for immigration and naturalization.[9] Pursuant thereto, an annual quota for "Chinese persons" was fixed at 105 regardless of place of birth.[10] This was in addition to the existing quota of 100 for non-Chinese persons born in China and eligible for naturalization pursuant to the Immigration Act of 1924 which established the National Origins Quota System.[11]

The Act of December 17, 1943 did not define "Chinese persons." However, by regulation, the term as used in section 2 of the Act was defined to mean "persons who are of as much as one-half Chinese blood and are not of as much as one-half blood of a race or races ineligible to citizenship."[12] And in July, 1946 Congress did define Chinese persons in an act entitled "admission * * * of persons of races indigenous to India." It provided that for the purposes of section 2 of the 1943 Act the term "Chinese

---

2. 66 Stat. 217 (1952), as amended, 74 Stat. 505 (1960), 8 U.S.C. § 1255 (Supp. III, 1959–61).

3. 22 C.F.R. § 42.1 (1962 Cum.Supp.).

4. 22 C.F.R. § 42.56 (1962 Cum.Supp.).

5. 22 C.F.R. § 42.55 (1962 Cum.Supp.).

6. 66 Stat. 176, 8 U.S.C. § 1152 (1958).

7. See United States v. Wong Kim Ark, 169 U.S. 649, 653–654, 18 S.Ct. 456, 42 L.Ed. 890 (1898).

8. 22 Stat. 58 (1882).

9. Act of December 17, 1943, 57 Stat. 600 (1943).

10. Presidential Proclamation 2603, February 8, 1944, 58 Stat. 1125, reprinted in Immigration and Naturalization Service, Laws Applicable to Immigration and Nationality 1167 (1953).

11. 43 Stat. 153 (1924).

12. 8 C.F.R. § 110.35 (1944 Cum.Supp.), reprinted in Immigration and Naturalization Service, Immigration and Nationality Laws and Regulations as of March 1, 1944, p. 744.

person" shall mean any person who is as much as one-half Chinese blood and eligible to naturalization.[13] Significantly, this definition was designed to prevent orientals other than Chinese from claiming privileges under the Chinese Exclusion Repeal Act, and was similar in objective to a like provision covering persons of the East Indian race.[14]

Finally, by the Immigration and Nationality Act of 1952, race as a barrier to immigration and naturalization was eliminated. Congress, in establishing a comprehensive framework for immigration and naturalization, repealed the provisions of the 1943 Act relating to "Chinese persons" as well as that section of the 1946 Act which defined the term.[15] Thus, in the consideration of our problem it must be borne in mind that since 1952 there has been no legislative definition of Chinese persons.

Sections 201 and 202 of the 1952 Act took the place of pre-existing acts or portions thereof covering the quota system.[16] Under predecessor acts the determination of the annual immigration quota was based on the "national origin" formula. The new Act substituted "quota areas" for the term "nationality" as more appropriate in determining the annual immigration quota. A "quota area" is allocated to each independent country, self-governing dominion, and mandated or international trusteeship territory, other than the United States, its outlying possessions and the countries of the Western Hemisphere.

Under section 201 the annual quota attributable to a particular quota area is the same number which was previously determined in establishing the national origins quota under section 11 of the 1924 Act. In practical effect, this obviated a redetermination of the annual quotas under the new Act.[17] Several qualifications should be noted. One relates to the computation of quotas for quota areas within a geographical area designated as the Asia-Pacific triangle, since national origin quotas had been previously unavailable for natives of those areas. Roughly, the Asia-Pacific triangle embraces all Asian countries from India to Japan and all Pacific islands north of Australia and New Zealand.[18] Another exception provides that the existing quota for "Chinese persons" was to be continued. This continues the quota of 105 for "Chinese persons" established following the passage of the 1943 Chinese Exclusion Repeal Act. Congress thus provided for two quotas; one of 105 for "Chinese persons" and a "China" quota of 100 available to non-Chinese persons who were born in China.[19]

Also pertinent to our problem is another quota of 100 established for the Asia-Pacific triangle under section 202.[20] This section provides for the separate quota areas and deals with the determination of the quota to which an immigrant is chargeable. Under section 202 each independent country, self-governing dominion and territory under the international trusteeship of the United Nations wholly within the Asia-Pacific triangle is treated as a separate quota area and allocated a minimum annual

13. 60 Stat. 416 (1946).

14. H.R.Rep. No. 854, 79th Cong., 1st Sess. (1945), reprinted in U.S.Code Cong.Serv. pp. 1250, 1251–52 (1946).

15. 66 Stat. 279 (1952), Immigration and Nationality Act of 1952, § 403(a) (44), (45).

16. 66 Stat. 175, 8 U.S.C. §§ 1151, 1152 (1958).

17. See H.R.Rep. No. 1365, 82d Cong., 2d Sess. (1952), reprinted in U.S.Code Cong. & Admin.News 1653, 1689 (1952).

18. See Gordon and Rosenfield, Immigration Law and Procedure, § 2.26c (1962). The boundaries of the Triangle are set forth in § 202(b) of the Act, 8 U.S.C. § 1152(b) (1958).

19. See Presidential Proclamation 2980, 17 Fed.Reg. 6019, set forth following 8 U.S.C.A. § 1151 at p. 188.

20. 66 Stat. 176 (1952), 8 U.S.C. § 1152 (1958).

quota of 100,[21] the sum of all the minimum quotas not to exceed 2000.[22] And, as already noted, there is the separate quota of 100 for the Triangle itself.[23] Under the 1952 Act, neither this separate quota of 100 nor the quota of 105 per annum for "Chinese persons" was subject to decrease, as was the case in the instance of other separate quota areas within the Triangle.

The general rule under section 202 is that an alien is chargeable to the quota area of his place of birth. However, section 202(b) contains, with respect to all the quota areas within the Asia-Pacific triangle, exceptions to the general place of birth rule in determining quota eligibility. Special criteria are established for any alien who is attributable "by as much as one-half of his ancestry to a people or peoples indigenous to the Asia-Pacific triangle." Subdivisions (b) (2)–(6) delineate the factors which govern the quota area to which such an immigrant is chargeable, whether to the separate Asia-Pacific quota or to one of the separate quota areas within the Triangle.

Against this background of the Act we consider the question of plaintiff's quota chargeability. As already stated, his father is a full-blooded Chinese and his mother is a full-blooded Indonesian. China and Indonesia are each within the Asia-Pacific triangle. His birthplace, Surinam (Dutch Guiana), is outside the Triangle. Upon this factual situation, that is, birth outside the Triangle, with ancestry attributable as much as one-half to peoples indigenous to two separate quota areas (China and Indonesia) within the Asia-Pacific triangle, plaintiff comes clearly within section 202(b) (6), which provides:

"[S]uch immigrant born outside the Asia-Pacific triangle who is attributable by as much as one-half of his ancestry to peoples indigenous to two or more separate quota areas situate wholly within the Asia-Pacific triangle, or to a quota area or areas and one or more colonies and other dependent areas situate wholly therein, *shall be chargeable to the Asia-Pacific quota.*" (Emphasis supplied.)

If the issue were to be confined to the language of this statutory provision, plaintiff is chargeable to the Asia-Pacific triangle quota. This much is conceded. Notwithstanding, the defendant has determined the plaintiff is chargeable to the quota of 105 for "Chinese persons"— a conclusion reached solely by the application of regulations promulgated by the Secretary of State designed to implement section 202 as well as 201(a). The pertinent regulations which bring about this result are sections 42.1, 42.55 and 42.56 of Title 22 of the Code of Federal Regulations.

Section 42.1 provides:

" 'Chinese person' means an alien who is attributable by as much as one-half of his ancestry to a people or peoples indigenous to China."

Section 42.55 provides:

"The quota chargeability of a quota immigrant who is attributable by as much as one-half of his ancestry to a people or peoples indigenous to the Asia-Pacific triangle and who is not a Chinese person

---

21. The minimum annual quota appears in § 201(a), 66 Stat. 175 (1952), 8 U.S.C. § 1151(a) (1958).

22. § 202(e), 8 U.S.C. § 1152(e), as originally enacted, provided that if the quota areas within the Triangle increased beyond 20 (by reason of political change), then there was to be a proportionate decrease in the minimum quota of such areas so that the sum total of all the minimum quotas shall not exceed 2000.

However, due to the increase in independent countries, the ceiling of 2000 was removed in 1961 at the request of the State Department, 75 Stat. 654 (1961), 8 U.S.C. § 1152(e) (Supp. III 1959–61); H.R.Rep. No. 1086, 87th Cong., 1st Sess. (1961), reprinted in U.S.Code Cong. & Admin.News 2950, 2979 (1961).

23. Immigration and Nationality Act of 1952, § 202(b) (1), 66 Stat. 176, 8 U.S.C. § 1152(b) (1) (1958).

shall be determined by the provisions of section 202(b) of the Act * * *."

Section 42.56 provides:

"A Chinese person who is classifiable as a quota immigrant shall be chargeable, regardless of his place of birth, to the quota for Chinese persons of 105 annually authorized under section 201(a) of the Act * *."

The operative effect of these regulations as applied to the plaintiff is that, although under section 202(b) (6) he is chargeable to the Asia-Pacific triangle quota, the defendant has found him chargeable to another quota, that of "Chinese persons."

Section 202 in no single instance, in providing for the determination of quota chargeability of those within the Asia-Pacific triangle, refers to or defines "Chinese persons"—the reference is to "any alien who is attributable by as much as one-half of his ancestry to a people or peoples indigenous to the Asia-Pacific triangle." That is the statutory guide. The language is clear and unambiguous and requires no implementation or interpretation. The regulation which defines "Chinese persons" and that which expressly excludes such persons from chargeability to the Asia-Pacific triangle quota not only disregards the clearly expressed reference to ancestry in section 202 for quota chargeability purposes, but results in its emasculation as applied to the plaintiff.

The justification advanced for the defendant's position is that Congress, by the 1952 Act, "intended special handling of Chinese persons." Essentially, the argument is that Congress intended that a Chinese person should be chargeable to the racial quota of 105 regardless of his place of birth and that no other quota was to be available to him. In support of this position, the defendant stresses that section 201 expressly provides that the previously existing quota

for Chinese persons (105) was not to be diminished; also underscored is the separate quota for China available only to non-Chinese born in China. Government counsel emphasizes that this was not done in the instance of any other Asian country. Accordingly, "the Secretary of State was of the view that Congress intended that quotas chargeable for Chinese persons should be governed by a rule exceptional to the general rules of quotas chargeable for other Asians under section 202(b) of the Act." Furthermore, it is contended "that it would not be equitable to restrict non-Chinese persons born in China to the 100 per annum China quota and yet permit Chinese persons to have access to all other quotas within the Asia-Pacific triangle."

The essence of the defendant's position, however phrased, is that while Congress set up special provisions governing quota chargeability of aliens indigenous to the Asia-Pacific triangle, as that term is defined in section 202, it also intended, but failed, to include an exception applicable only to Chinese persons to prevent them from using any quota of a quota area within the Triangle so as to restrict the quota available for Chinese persons, regardless of place of birth, to 105—in final analysis, that section 202(b) was intended, as a general rule of quota chargeability, for all Asians except the Chinese.

Based upon this view, the regulations purport to fill the claimed legislative gap. But they do more—they not only disregard the clearly defined statutory reference to ancestry, but in fact constitute legislation on the subject going beyond any delegated authority.[24] To accept the defendant's argument is to render the creation of the separate quota areas within the Asia-Pacific triangle and the separate quota of the Triangle itself meaningless as far as Chinese persons are concerned. I find nothing in the reports of the legislative history of the Act to support the defendant's

24. Cf. Manhattan General Equipment Co. v. Commissioner of Internal Revenue, 297 U.S. 129, 134, 56 S.Ct. 397, 80 L.Ed. 528 (1936); American President Lines v. Mackey, 120 F.Supp. 897 (D.D.C.1953).

contention that an exception applicable to Chinese persons was carved out in establishing the Asia-Pacific triangle quotas. And if Congress had so intended, it could have achieved this result directly and with certainty.

Reference has previously been made to the fact that the only time Congress defined "Chinese persons" was in the 1946 Act relating to the admission of East Indians, that this was repealed by the 1952 Act, and that since 1952 there has been no legislative definition of Chinese persons. In 1946, when East Indians also were made eligible for immigration, Congress knew how to provide for a possible conflict, that is, for the persons fifty percent Chinese and fifty percent Indian. When it wanted to define Chinese person to mean an alien attributable by as much as one-half his ancestry to a people indigenous to China, it had no difficulty in saying so. And, in defining an alien for purposes of quota chargeability in section 202, it used the all-embracing expression "any alien who is attributable by as much as one-half of his ancestry to a people or peoples indigenous to the Asia-Pacific triangle."

Finally, such historical matter that exists, to the extent that it may be considered relevant, is contrary to the defendant's contention. Walter M. Besterman, the Legislative Assistant to the House Committee on the Judiciary, who played a significant role in the drafting of the Act, in his commentary on section 202 and the operation of the Asia-Pacific triangle provisions, gives several samples of quota chargeability thereunder. One pertinent to our issue is as follows:

"(5) *Sample cases under section 1152(b) (6).*

\* \* \* \* \* \*

"Mr. T. U., born in Great Britain of a Hindu father and a Chinese mother, is chargeable to the 'Asia-Pacific quota.' " [25]

Needless to say, the Government challenges this as incorrect as it necessarily must in view of the regulations. While certainly Mr. Besterman's view is not conclusive, our Court of Appeals has seen fit to give a respectful ear to his comments on the 1952 Act.[26] In any event, the clear language of the statute controls and the regulation must yield.

The plaintiff's motion for summary judgment is granted and the defendant's motion is denied.

---

25. Besterman, Commentary on the Immigration and Nationality Act, 8 U.S. C.A., Part I, pp. 1, 23.

26. Costello v. Immigration and Naturalization Service, 311 F.2d 343, 345 (2d Cir. 1962).